Good morning, your honors. My name is George Foreman. I represent the tribe in this case. With me this morning is Mr. Jay Shapiro, an associate in our office. And I'd like to introduce you to the panel to the chairman of the tribe, Mr. Wayne Mitchum. And I'd like to reserve five minutes for rebuttal, please. May it please the court, in California v. Wilson, this court noted that when Congress passed the Indian Game and Regulatory Act, it did not create a mechanism in which a state might make empty promises in good faith negotiations and then repudiate them with immunity in the event of a dispute. That's exactly what the district court's decision, if affirmed, would accomplish. In this case... Could you explain to me? I had trouble understanding this system. It's very complex. And I guess the critical thing that I want to know is, if you get what you want, do the other compact tribes get less money? Absolutely not. If Calusa prevails on its claim for a refund of annual license fees that the state concedes it does not owe and never likely will owe, the so-called non-compact tribes, the tribes that receive distributions from the Revenue Sharing Trust Fund, will not be out a penny because the state... The goal is different from what I asked. If the deal is we share this pool of money among everybody who falls into this category and it's shared equally, nobody owes anybody anything. But if more people are put into the category, then the amount of money that the others receive is less. That's what I'm trying to find out. Your Honor, I think it's confusing two separate issues in the case. I'm sure you're right because I don't understand it. There are two pools, if you will, in this case. One is a pool of gaming device licenses that is created by the compact and is quantified by a formula that is, we contend, deliberately ambiguous. It was drafted and imposed by the state. And that's one of the cruxes of this case is how many licenses are there? This is the formula where you take 350 times the number of tribes? Yes. Put another way... Of non-participating tribes. That's right. Put another way, is zero a number less than 350? That's the question on which the formula depends. The other pool that Justice Kleinfeld was referring to is the Revenue Sharing Trust Fund, which is a fund from which tribes that operate anywhere from zero to 350 machines receive up to $1.1 million a year. And if there's not enough money in the fund, then the fund is allocated in equal shares. The state may make up the difference, right? That's through the SDF? The legislature has provided that the SDF, the Special Distribution Fund, will be used to make up any shortfalls. But the state is under no obligation to make up that shortfall, is that correct? Until the voters approved four amended compacts this past February and one other compact that took effect January 1st, that would have been correct. Under the new compacts, under these newly amended compacts, the state is obligated to make up in full any shortfalls in the Revenue Sharing Trust Fund from the general fund revenues submitted by these other five tribes, even if the SDF were to go away tomorrow. So does that only apply to the tribes that have the new compacts, or does everybody else get the benefit of that as well? It provides that those tribes' contributions to the general fund will be used to make up any shortfall in the Revenue Sharing Trust Fund, whether the SDF stays or goes. So the non-compact tribes will be kept whole. So what you're saying is if you win, yes, on the first step, the other tribes in fund number two, the Revenue Sharing Trust Fund, will get less. But then in step number two, the state will reimburse the trust fund for the difference between what it had and $1.1 million, so everybody will get just as much as they would have gotten anyway. Not exactly, Your Honor. What I'm saying is that the tribes that receive distributions from the RSTF do not have a legally protected interest in receiving payments that another tribe is not obligated to make. I didn't ask, actually. I wasn't up to that on the law. I'm trying to understand the facts, the way the system works. My thought is that sometimes there will be enough money put in so the $1.1 million is irrelevant. There will be $2 or $3 million. Maybe it hasn't happened yet, but gambling seems to be a substantial industry. Sometimes it will be short. And regardless of what legal obligations there may be, I want to know how much money people make if your clients win as opposed to if they lose. If our client wins on the refund claim, our client gets back the $403,000 it puts in, and the non-compact tribes get exactly the same $1.1 million a year that they would if the refund were not made. And that's because of the backfill aspect that the legislature has already taken care of and these five new compacts that guarantee that the non-compact tribes will be kept whole. So you get your $400,000, but they don't lose a thing because the state has to make it up? That's correct. Okay. But that's only one aspect. The other pool is the license pool issue. And that's what I would have thought the original question was most concerned with. If you get the relief of being moved up a tier or two, why won't that necessarily affect the other tribes that would either be in that tier or would receive licenses and draw in that tier or be bumped out of that tier? A couple of reasons. And one of those reasons actually also impacts Judge Kleinfeld's question, and that is that if the pool has as many licenses as we think there are in it, first of all, the non-compact tribes will get more money because there will be more license fees paid. But secondly, and as the court observed in the Wichita v. Hodel case, the mere fact that there's a common fund may give other parties an interest that renders them necessary, but not necessarily. If the pie is big enough, it's entirely possible that a tribe such as Colusa can get the licenses it seeks, its neighbors can get the licenses they seek, and there will be plenty of licenses left over. In our case, we believe there is. Even if you had an unlimited number of licenses, wouldn't it still be in the interest of other tribes to keep your tribe from getting a license? I mean, if you're running a casino with a bunch of slots, you'd probably make more money if there's not another one within easy driving distance. Sure. And that's what the courts have said is a mere financial interest, not a legally protected interest. And in this case, each tribe that has a compact has – there is no guarantee in that compact of market share. There is no guarantee that your neighbor isn't going to put in more machines than you will. There is no guarantee that your neighbor, as happened in 2004, won't go back to the state and negotiate an amendment to the compact that allows unlimited slot machines. And that happened with three of Colusa's neighbors. And so as far as whether it be licenses or the draw priorities, everybody has a common interest in ensuring that the compact that each tribe negotiated with the state is fairly and correctly interpreted. And what the district court has done here, and would be done if the court were to affirm, is to lock – in the guise of avoiding the litigation of absent tribes' interests, the district court, in fact, did the opposite. It did litigate the interests of every tribe in California and locked those tribes into the state's reinvention of what the compact means and locked those tribes out of the courthouse if anybody disagreed. Does your argument that other tribes' interests aren't affected if you get your relief in the tier claim – does the success of your point in that regard depend on your challenge to the upper limit of licenses? Not exactly, and here's why. The issue of the draw priority is a separate issue from the size of the pool. Although, if the pool is large enough, draw priority becomes less and less important. Well, that's what I felt was your answer to the draw priority question, was that, well, it won't hurt other tribes if there are enough licenses. Well, more to the point, no tribe has a legally protected interest in excluding another tribe from drawing in the priority tier to which the tribe is entitled. How many – are the tiers limited in numbers? There are five tiers. Yeah, no, I meant within the tier, is there a limit on the number of tribes that fall into a tier? No. It's just how many machines you have, supposedly, at least the first time you're at it. How many machines you are authorized to operate on September 1, 1999 versus how many licenses you have drawn in successive rounds of draws. And our point on that is that the way the state has interpreted the tiers, if you draw even a single license, you drop down in priority. If the reason you don't get the licenses you asked for is the state says they're not available and you get a couple of licenses, you're pushed down another draw priority. However, Calusa has now been pushed into the same priority tier as tribes that operate over 1,500 machines, and no tribe has ever drawn in the fifth tier. And the last few times, tribes haven't drawn in the fourth tier. According to the state, all the licenses are gone. So for the balance of his compact, Calusa and Pasquenta and all the other tribes around that have the 1999 compacts are doomed to stay exactly where they are. While other tribes go to the state that can afford the price the state is demanding and get the right to unlimited machines or 7,500 machines or 5,000 machines. Let's see, the reasons that the other tribes do not have a legally protectable as opposed to a mere financial interest is that, well, it can't be anymore that they'll still get the same money because the state will make it up. It has to be because they'll still get the same number of machines. Again, the money is separate from the machines. The only tribes that get money are tribes that operate from zero to 349 machines. So the big ones like this one, the issue is how many machines are licensed. Relatively speaking, we're not that big. We have 846 machines. Rumsey has... That puts you in the category where you share a pot of machine licenses, right? No. It puts us in the third tier of tribes that operate between 501 and 1,000 machines for purposes of drawing additional licenses. Part of the problem here is that... Well, your argument is they should put you in. Well, yes. Fair point. The problem we have here is that nobody knows how big the pool is. And if we're right, and there are 56,000 licenses, and the state has only issued 32,000 licenses, and there are approximately 5,500 unsatisfied requests for licenses among 21 different tribes, we've got a 19,000 license surplus today, and all we're asking for is 377 licenses. This is not like Macaw, where we have a finite natural resource, where you have a scientific and administrative process for quantifying the resource and then allocating that resource among people that have vested treaty rights to certain portions of the resource and state rights to others. This is not a situation where you have a some certain to which people are making conflicting claims where you know how much is in the bank. We're talking not about fish. We're talking about pieces of paper that the state can produce in limitless quantities with no impact on anybody. And so the relief we've asked for, whether it be on the draw priority or on the quantification, will not expend itself on any other tribe. Are you asking the court in your complaint to award a certain number of licenses to you? We have asked as relief that the state either issue 377 licenses or that the state be enjoined from claiming that Calusa is in violation of its compact if it operates the number of licenses, the machines authorized by the number of licenses Calusa should have received had it been allowed to draw in its proper draw priority, provided that Calusa pays the license fees that are required under the compact. Are you saying that this is like if a town has three cab companies, Yellow Cab, Checker Cab, and Luxor Cab, and Luxor Cab says we want another hundred medallions, and Yellow and Checker, of course, don't want Luxor to get another hundred medallions, that Yellow and Checker are like the other tribes in this case, and their only interest is in limiting the number of licenses that the new cab company gets, which isn't protectable. Is that the way the system works? It's like giving more medallions to your cab company. It doesn't take anything away from the others? Essentially, given the surplus of licenses that we believe the pool contains, that's exactly the situation. The compact was never set up to be anti-competitive, to guarantee certain tribes a perpetual competitive advantage over all other tribes. In fact, the license draw process was intended to do exactly the opposite, to allow tribes to get into rough parity as long as the pool wasn't exhausted. Is there any scenario under which in order for you to obtain the 377 licenses that another tribe would have to give up licenses that it currently has? No. We've not asked for that. In granting us relief, the court could easily shape relief to avoid such a result were that to be the case. The problem we have is under the district court's decision, if the state tomorrow were to say we added wrong, there's only 25,000 licenses, not 32,000, give them all back, folks, there's no remedy. Because we couldn't challenge that without having to join all of the other tribes in the state of California. In fact, under the district court's formulation, if the state were to sue, if let's say we had a dispute about how to count gaming devices, what's called a multi-station game where you have multiple seats at a table but a single random number generator, we say that counts as one machine, and the state says each seat is a separate machine, so you have to have a separate license for each machine, and you have one of these machines, and so you're 10 over your quota of licenses. And if you don't stop doing that, we're going to bring an action against you under 11.2.1c of the compact for a declaration that you're in material breach, and if we're right, we get to terminate your compact. And the state files that suit. CALUSA files an answer, asserting as a defense, no, the state's interpretation of the compact is wrong. We think that gaming devices are counted a different way. Under the district court's decision, we couldn't assert that defense because we couldn't bring in all the other tribes in the state of California that have similar compacts. And that's the fundamental vice here. The district court should never have gotten past the question whether the other tribes are necessary parties because they're not. There are no inconsistent obligations to which the state could be put. The state may well end up dealing differently with one tribe versus another, but the state is not precluded from doing so. The district court basically assumed as fact, not what we alleged in our complaint, but what the state, without any anchoring in evidence, simply asserted about competitive disadvantage, financial interests, et cetera. It assumed them as fact. It shifted to us the burden to show that the other tribes were not necessary rather than imposing on the state the burden to show that they were, and was incredibly prejudicial. We didn't even get a chance to have a hearing. This case was decided on the papers. And so we never had a chance, for example, to amend our complaint to attempt to bring in the other tribes who may or may not have asserted their sovereign immunity. There are a lot of tribes that agree with Calusa. We even submitted declarations from the chairs of several of those tribes agreeing with our interpretation of the size of the pool. We never got our day in court. I'd like to reserve the balance of my time. Thank you, counsel. Thank you. Still good morning, Your Honors. Peter Coffman, Deputy Attorney General for Governor Arnold Schwarzenegger, California Government Control Commission, and the State of California. What the appellant is asking this court to do is to disregard the sovereign immunity rights of the tribes that have not and cannot be joined in this litigation. I need the same kind of help I needed from your adversary since I'm so ignorant in this area. Your adversary says they can get everything they want without any other tribe having a legally protectable interest impaired. You obviously would take a contrary position, explain factually how the other tribes get hurt. Let me start because there are four parts to Calusa's request for relief. The first is, let me just start with the Revenue Sharing Trust Fund, which is a fixed amount of money that tribes that operate 350 or more devices are required to pay.  Revenue Sharing Trust Fund money is to non-compact tribes, tribes that operate less than 350 devices or no devices at all. I want to raise one point. Counsel has raised the issue of new legislation. This is something that has not been briefed, has not been presented to the court, is not on the record below. I know for a fact, and I'm not sure exactly what his argument is because it hasn't been made in any of the briefing, how he interprets the new compacts or any legislation arising out of them. But I do know for a fact that non-compact tribes have asked the voters to disapprove the compacts because they felt they would not be guaranteed additional monies from the or the legislature would not be required to make appropriations. Why don't you talk about the law as it is rather than as it may become. Well, I think the point is this issue hasn't been briefed. I think we have to operate on the record as it was or at least open. If the court is interested in that, we need to open it. But I would point out that in any event, an appropriation from the legislature is a yearly matter. A distribution from the Revenue Sharing Trust Fund is a quarterly matter. They have an argument in their brief that the fund itself really is supposed to be composed of money that was owed to it and that they really didn't owe this money. And it's like, suppose they overpaid, accidentally slipped when they wrote a check and overpaid by a million dollars. Would they then be stuck? Would they have to join every other tribe to get it back? Well, an error is one thing. A payment of a nonrefundable deposit and claiming you're entitled to a refund of what is titled a nonrefundable deposit is quite another. Well, they say it's an error if you're never going to be able to use it. Well, that's speculation on their part because licenses are returned to the pool all the time and they become available. Licenses as recently as the summer were returned to the pool by tribes that didn't use them. But whether they can get it back or they can't get it back is a matter that's not before this court because the question is whether we have to join all the other tribes in order to do it. So as I understood Judge Canby's question to you was, if the tribe had written the check and added another zero on there that they weren't supposed to, paid too much in on this nonrefundable, can they get it back without joining all the other tribes? Yeah, I think that's right. And that has been done. I mean, that's not a required nonrefundable deposit because it clearly was an error. That's not what the compact is talking about in terms of if the sum is correct, if they deposited as a nonrefundable deposit exactly what was required under the compact. If they paid money into this fund that they believe that they will never be able to draw against and therefore it's in some way unconscionable, wrong, wrong as a matter of law, not under the compact, whatever the argument is, again, not before us at this point, why do we have to have every other tribe in the suit before we can decide that question? Well, that's another question because that gets to the issue that was raised in American Greyhound, which becomes a circular argument. You're judging the merit of their argument in determining whether the absent parties have a claim. If the absent parties have a claim, whether they may be right or they may be wrong about the claim, they need to be joined in the action. You can't decide the question and then rule that they're not. Why can't we decide the question of whether they've wrongfully paid into this? That's a very different question from a provident tradesman kind of situation under Rule 19 where we have a single pool of insurance funds and you have to have everybody who's going to have a claim on the insurance funds before the court, otherwise you're going to end up with inconsistent judgments. Well, you're going to have the same possibility. Are we just talking about the RSDF at this point? Right. First, the parties who are entitled to that money have a claim on that money. They're third-party beneficiaries under the contract. Not if somebody's wrongfully paid into the fund. They don't have a claim on money that's been wrongfully paid in. But the absent party's claim is that the money was properly. Why can't we handle that through the amicus rules or through intervention rules rather than through Rule 19 and say if we don't have everybody, then we can't decide the question at all? Well, that question's been answered in McCaw and Viverdi where they said amicus participation by a party that's otherwise indispensable or unnecessary is insufficient. That begs the question, why are they necessary to this if the contention by the CALUSA is we have wrongfully paid this money into the fund? Because they become necessary because they have a different point of view. A different point of view doesn't make them necessary. Well, they have a protectable interest in assuring that there isn't a raid on the irrevenue-sharing trust fund money. They don't have any interest if the CALUSA have wrongfully paid in the money. But that's the question to be decided. And you're saying they have a right to be heard on that issue. That's correct, Your Honor. I think I'm having trouble understanding. It seems like any restitution claim would be potentially debatable and that the other parties with an interest in the fund would have an adverse interest to the party seeking restitution from the fund. But you can't have. And once you say, well, there's an exception if the clerk just put the wrong number on the check, I don't understand how there can be an exception for that unless there's an exception for claims generally of erroneous overpayment. Well, I may have gone a little bit overbound, Your Honor. I may have misunderstood the question, but if the absent party has a claim to that money, has a claim to the issue that's being raised in the lawsuit that's adverse, potentially adverse to the claim that the party bringing the lawsuit has made, they're a necessary party because they have a right to have their position heard before it makes its claim. If I think that I've overpaid Social Security, do I have to attach everybody in the country who has a Social Security claim because they're drawing from a common fund that's likely to go dry before it can satisfy all the claims against it? No, Your Honor, that I don't believe. Okay, then explain to me what the difference is between that analogy and your situation. Because this is a compact claim that the parties... The compact makes it sound like you have a whole bunch of signatories to a single compact. You don't. What you really have here are very similar or identical compacts that are really in the nature of individual contracts between the State and each tribe. If these were all signatories to the same compact, you might have a very good argument. The State doesn't. You have a compact between a single entity, the State, and another entity, the Colusa. Well, no, because these... Again, we're going back and forth between the licensing portions of the compact and the revenue-sharing trust fund portions of the compact. But they are identical and are intended to create a single inseparable interest. Now, granted, when you can segregate and separate the interests of absent parties, you have a different situation. Here, you can't separate them because you run the risk of inconsistent obligations on the part of the State. The State can't, for example, with licenses, there is a single number. All the compacts have the same provision. There is a single aggregate number for the license tool. There can't be more than one number. There can't be two different versions of it because the State has to know which number to use in allocating licenses. It needs to know which number to use in terms of receiving revenue-sharing trust fund monies from those who are obligated to pay them. That's a different situation from Social Security where there's a... Parties aren't so bound. Individual recipients of that are not in that same situation because there isn't a single... number that all compacts have in them. And, in fact, the provision in the compact says that all tribes are bound by that single number. In every compact, there is that provision in Section 4.3.3A1 that this is an aggregate number that binds all the tribes to these identical compacts. That's a different situation. It's a single number even though there are separately signed compacts. Each of those separately signed compacts has agreed that they have bound themselves to this single number. It has to be a single number. Well, there's an argument over that single number, and I think what Calusa is saying is we're litigating to raise that number. There are lots of other tribes who would like the number raised, but we can certainly represent them. I mean, you know, their interests won't be compromised by our representation in this case. What's the... What's wrong with them litigating and then the state says, okay, for the purpose of this compact, the number is X, and then presumably the state would have to apply it in the other compact. Well, first of all, I can answer because there's an assumption in your question that Calusa can represent the interest of all tribes that have an interest in obtaining more licenses. I mean, I think it's interesting to note that we have two cases brought that are separate where the tribes have not agreed on a unified position. They haven't agreed to a single council, and we have a third case which we've given the court notice of involving San Pasuelvan. They have an entirely different suit pending, making, you know, their own arguments. I think it's not an assumption that this court can make  in getting more licenses. That's true in lots of litigation. We have other people that have interests. We have zoning cases in which a zoning regulation may have an impact on other folks. They do not have a legally protected interest to be drawn in as a party necessarily, but we have generous intervention rules. We have generous amicus rules, and there are other ways of protecting their interests besides saying, since we can't get everybody, we won't answer anybody's question, which is where we've been left. Well, again, I think this circuit has found that amicus participation is not adequate, and that intervention is not adequate. They have to be indispensable. The critical thing is whether they're indispensable, not whether amicus participation is adequate. If they're not indispensable because they won't have a legally protectable interest harmed, then the litigation can go forward without them. Well, I think it's if they're necessary. Well, as I understand it, it's their ability to participate is part of the necessary party test. It may have been spoken of. And if they are necessary parties, if they're necessary parties, then the question becomes whether the parties in the proceeding can adequately represent their interest. The first category here, I mean, the suggestion is that there are only two sides to this question, tribes that want more license, tribes that want to accept the existing determination by the commission. But my point is that there are more interests than just those two, and it's demonstrated by the fact that we've got three separate cases brought by three different tribes, represented by three different councils, making three different points. Let's assume you're right on that for the moment. We'll probably be coming back to it. I'm confused. If they do get into a tier that lets them get more licenses, why isn't it like giving more taxicab medallions to one company? The other companies may not like it, but they have not had a legally protected interest invaded, so all they can do is object at the city council meeting. Well, they can do more than that. Well, in this case, the absent tribes can do more than that because they have a claim to the single aggregate number. I don't know what the law is granting monopoly to or licenses for taxicab operators. Commonly a town will say there will be 100 medallions or 1,000 medallions or whatever, but they can raise it. But here it can't be raised. There's just one number, and all the absent tribes and all the tribes have an interest in what that number is. Now, for example, the record demonstrates that there are multiple interpretations of the aggregate number. It's been 23,000, 32,151, 58,000, 64,000, and then Calusa's come up with a calculation of 56,000. The way it's left is the state gets to say which it is. Well, that's not something that the state did deliberately. I mean, the Rule 19 and tribal sovereign immunity existed long before the Compact and long before the California Government Control Commission made its decision. What we're talking about here is something that's happened before. At least eight times this circuit has faced the same sort of question. Should they weigh or when they weigh tribal sovereign right to assert tribal sovereign immunity not to be brought into a lawsuit that affects something on which they have an interest, a protectable interest, versus, in this case, Calusa's economic interest in trying to obtain 377 more gaming licenses? The position that you're in then, though, is that we can't let Calusa go forward with this and establish a total number of licenses in litigation between just the state and Calusa because that will set a number for all these other compacts. So instead, the state will set the number. I know you're not saying that isn't where you started, but that's where you're at, that it's much more of an interference for Calusa and the state to litigate it so that some court decides what the number really is. That's too much of an interference with other tribes, but it's not too much of an interference with the other tribes just to have the state set the number. Yes, but let me make one point. The assumption here is always that the number is going to go up when a court makes a decision, but the number could go down to the 23,000 number. That would really have an impact. A lot of tribes might not want to participate and risk that there could be that kind of a change in the number. Explain why the tribe isn't entitled to a judgment on that. Sovereign immunity indicates that tribes have the right to avoid litigation that could affect their interests. They have a right to assert that sovereign immunity, and if they're necessary parties, they become indispensable parties because of that. Let me point out about the compact. The compact recognizes that there's going to be a scarcity of licenses. You don't have a draw process for licenses if you think that everybody's going to get everything that they want. There was an absolute number set, and then there was a draw process established. That indicates that there's a scarcity. The compacts also provide, and it's a rather unique provision, that these compacts, which went into effect in 2000, provide for a mandatory reopening at the request of tribes or the state. On the very issue of the number of licenses that would be available, and that is to be arrived at through a compact amendment. And what I'm suggesting to this Court is that the compact recognized that there was a scarcity of licenses, there wouldn't be enough to go around, and that after a three-year period, tribes could then renegotiate their compacts on an individual basis, get outside the pool, as many tribes have done, and acquire the licenses they wanted through that process. And I think the reason why they provided for that process is that the compacts also provided, in Section 9.4, for tribal sovereign immunity against suits by other tribes being brought into a suit between the state and another tribe against their will. Now, this provision is not something that the state put into the compact. Section 9.4 of the compacts was brought in as a result of Proposition 5, which is found in California Government Code Section 98004, 98005. 98004 contains a model compact, which concludes the predecessor to 9.4 of these compacts. And that is where tribal sovereign immunity provision comes from in these compacts. It was not something the state put in. But I submit that when you have Section 9.4, which prevents tribes from being joined in suits between another tribe and the state, and you have a draw process which recognizes scarcity, we have an absolute number that is related to the draw process indicating the scarcity, and then you have a provision which provides for a re-opener after three years of a 20-year compact that allows for, specifically, for a change in the number of licenses and a new mechanism for getting more licenses or the ability to operate more slot machines. You have a recognition that there's going to be this problem, that this is just an interim solution of this draw process and this aggregate number. It was never intended to be a final number unless a tribe, but it was something that would allow the tribes to operate with a limited number of licenses, and if they decided that the market would bear more or that they needed more and they weren't able to get it out of the aggregate number that was in the compacts, they could renegotiate their compacts. And I say that's the solution that was intended by these compacts, not litigation. Counsel, you're over time, so why don't we hear Judge Canby's question. I'd like to ask a question, and it's off point. But your opponent has described the tier system as your initial eligibility to get into a tier depends on how many authorized machines you have. And then if you get into that tier and ask for 350 licenses and get one, you're bumped to the next tier even though the number of authorized machines should probably leave you in the tier you were in. And I wondered is that a correct statement? And if so, is there any simple explanation for it? I think I can give you a simple explanation for it. I would say that the commission has construed the draw process and the tier process in a way to make licenses available to tribes with compacts that haven't drawn before and to give every tribe an opportunity to get in. All the tribes haven't participated in the draw at the same time. Tribes have held off acquiring licenses even though they have a compact. They have waited to see what the market is. So they don't always participate in a draw at the same time. And the purpose behind the commission's decision was to allow late coming tribes Once you've participated in the process, you've participated in the process, you've had your opportunity to get licenses. Okay. Thank you, counsel. The answer to your question, Justice Canby, that you asked Mr. Kaufman is yes, that is exactly what the state's position has been, and that's how CALUSA is now in the fifth priority tier even though it does not yet operate or is authorized to operate more than 846 machines. The crux of this case was illustrated, I think, by one of Justice Bivey's questions, a number of them, as well as the other members of the panel. Who gets to decide who's right and who's wrong? Does the state get to dictate the meaning of the compact or the change in the meaning of the compact, thereby ripping out of the compact the dispute resolution mechanism under Section 9.1 that allows either party to go to a federal district court and get a neutral determination of what the compact means? Under the state's position, the state gets to dictate everything. The tribes get to say nothing except to accept whatever the state decides to impose on them. We would ask for leave to submit, if the court desires, a request for judicial notice of the five recently amended compacts that do guarantee full funding of the Revenue Sharing Trust Fund, if the court feels that would be relevant to your decision. As to the number, it's a finite number, but nobody knows what the number is, and until people know what the number is, how can the district court have determined, even if there were legally protected interests? Do you have an answer to the state's observation that there are already three different tribes litigating with different positions? It's correct. It's correct. People have determined, have taken different interpretations, made certain different assumptions that lead to different answers. The legislative analyst says that there's 122,000 licenses. We think that number is more than what the parties intended. We, unfortunately, don't know what the state really thinks is the number, except what they've told us after the fact because they wouldn't tell us during the negotiations. They said, we don't want the press to know how many more machines we've authorized, and this is in our complaint. What Mr. Coffman was just talking about is not in our complaint. What we've been talking about is what we alleged and which the district court apparently chose to ignore in deciding that our case couldn't go forward. It would be very helpful, frankly, for this court to make a ruling as a matter of law because there are no factual disputes on whether the number zero, whether zero is a number less than 350. And then we would have a decision that covers all of the districts in California that would eliminate these disputes, and we would know once and for all how big the pool is. Who did the district court have before it? Your complaint. Yes. And a motion? A motion for judgment on the pleadings. And then presumably the opposition. Yes. We also requested leave to file a motion for summary judgment or to convert the hearing on the motion for the ruling on the motion for judgment on the pleadings to a motion for summary judgment. The district court declined to do that and, therefore, bound itself to the face of our complaint. So we submitted declarations from other tribal chairs, for example, as to their understanding of the formula and how they would never have agreed to a formula that locked them out for all time if they didn't grab all the licenses they could immediately, even though they couldn't put them into effect within a year. The district court chose not to look at any of that stuff. The district court ignored our complaint, basically, and accepted what the state said at face value, even though there was absolutely no substantiation for what the state said. So with that, I will submit. Thank you. Thank you, counsel. Catch-all day band versus California is submitted.
judges: Canby, Kleinfeld, Bybee